**In re Alfred BINSTOCK and Rae Lynn Binstock, Debtors.**

**Bankruptcy No. 87–05372.**

United States Bankruptcy Court, D. North Dakota.

Sept. 24, 1987.

David Senn, Dickinson, N.D., for debtors.

Laroy Baird, Bismarck, N.D., for American State Bank.

Cameron Hayden, Bismarck, N.D., for U.S.A.

James Geyer, Dickinson, N.D., for FLB.

Phillip Armstrong, Minot, N.D., trustee.

Gary Ramsey, Dickinson, N.D., for Victor Froelich.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is a Motion For Relief From Stay filed by American State Bank and Trust Company of Dickinson (American). Alfred and Rae Lynn Binstock (Debtors) purchased a 1980 Windsor mobile home. On January 2, 1986, they refinanced the mobile home purchase by executing a promissory note to American. Rae Lynn's father, Victor Froehlich, co-signed the note with the Debtors. Under the terms of the note the Debtors were to pay American $19,279.63 on January 1, 1987. The Debtors have made no payments on the note. On April 22, 1987 they filed a petition for relief under Chapter 12 of the Bankruptcy Code (Chapter 12). The Debtors' Chapter 12 Plan of Reorganization, filed August 31, 1987, treats the debt to American as secured in the amount of $9,000.00 and unsecured in the amount of $10,279.63. American seeks relief from the co-debtor stay imposed by 11 U.S.C. § 1201(a) so that it may collect the unsecured portion of the debt from the co-debtor, Victor Froehlich.

At the hearing held in Bismarck on August 25, 1987 counsel presented the court with a stipulation entered into by American, Victor Froehlich, and the Debtors' attorney. Under the terms of the stipulation Victor Froehlich withdrew his objection to American's motion for relief from stay. The court rejected the stipulation because Victor Froehlich had not been advised by independent counsel. Mr. Froehlich has obtained independent counsel and submitted a brief opposing the Motion for Relief From Stay.

The issue presented by this motion is to what extent may a creditor obtain relief from the Chapter 12 co-debtor stay when the Debtors' reorganization plan provides that the creditor will receive pro rata payment with the other unsecured creditors. Section 1201(a) provides that a creditor may not take action against a codebtor of the Chapter 12 debtor except in narrowly defined circumstances now raised by this motion. Section 1201(c), in part, provides:

(c) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided by subsection (a) of this section with respect to a creditor, to the extent that—

\*　　\*　　\*　　\*　　\*　　\*

(2) The plan filed by the debtor proposes not to pay such claim; or

(3) Such creditor's interest would be irreparably harmed by continuation of such stay.

There are no cases interpreting this language under Chapter 12. As both parties have pointed out, however, 11 U.S.C. § 1301(c) contains substantially identical language to section 1201(c). For this reason the court will consider sources interpreting the language under section 1301(c).

The legislative history of section 1301 indicates that the original obligation of the co-debtor, to pay the debt if the debtor does not, survives a bankruptcy filing. The Senate Judiciary Committee Report states:

> Under the terms of the agreement with the co-debtor who is not in bankruptcy, the creditor has a right to collect all payments to the extent they are not made by the debtor at the time they are due. To the extent to which a Chapter 13 plan does not propose to pay a creditor his claims, the creditor may obtain relief from the court from the automatic stay and collect such claims from the co-debtor. Conversely, a co-debtor obtains the benefit of any payments made to the creditor under the plan.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 426 (1977), *reprinted in* U.S.Code Cong. & Admin.News 1978, 5787. Thus the co-debtor's liability for the original debt is unchanged by the bankruptcy filing.

The question becomes, at what point should the creditor be allowed to proceed against the co-debtor when the debtors are making partial payments to the creditor through the plan. In *In re Johnson*, 6 B.C.D. 12 (Bankr.W.D.N.Y.1980) the debtors' Chapter 13 plan proposed to pay 25% of the amount of the unsecured claims. The court determined the creditor did not have to wait until the conclusion of the plan and lifted the co-debtor stay in the amount of 75% of the creditor's claim. *Id.* at 13. A number of other courts, in the context of Chapter 13, have held that when a plan proposes to pay unsecured creditors a percentage of their claim, the creditor may immediately obtain relief from the stay for that portion of the debt not paid by the plan. *See In re Harris*, 16 B.R. 371, 377 (Bankr.E.D.Tenn.1982, *aff'd*, 721 F.2d 1052 (6th Cir.1983)) (discussing eight cases in which courts granted relief from stay to the extent the plan did not propose pay-

ment). The United States Bankruptcy Appellate Panel for the Ninth Circuit also takes the position that a creditor need not wait until payments under a Chapter 13 plan have concluded before pursuing the co-debtor for the portion of the debt not paid through the plan. *In re Jacobsen*, 20 B.R. 648, 650 (Bankr. 9th Cir.1982). In discussing the language of section 1301(c)(2) the court in *Jacobsen* concluded:

> The language is unqualified. There is no limitation on the creditor's right to sue the co-debtor for the amount not provided for *by the plan.* There is no requirement that suit be deferred while the debtor pays under the plan during a period of years.... It would make little sense to defer such relief when it is known that the creditor will never receive the unprovided-for amount, under the plan, from the debtor.

*Id.* (emphasis in original). The court in *Jacobsen* implies that there is no sound reason to act under the fiction that the creditor will be paid in full when there is a reasonable certainty to the contrary. *See Id.*

The difference between the cases decided under Chapter 13 and the current Chapter 12 case is that Chapter 13 plans include scheduled payments to the unsecured creditors, while the Chapter 12 debtor commits only to contribute all of his disposable income to the plan for payment to unsecured creditors for a term of three years. *See* 11 U.S.C. § 1225(b)(1)(B). The uncertain nature of the payments to the unsecured creditors under Chapter 12 makes it difficult for the court to determine how much payment is "proposed" by the plan. Victor Froehlich argues "[i]t is possible that the undersecured portion of the bank's claim could be paid in full by the Binstocks. The only way to definitely ascertain whether that will happen is to simply wait until the plan has run its course." As support for his assertion that American must wait until the conclusion of payments under the plan before pursuing the co-debtor, Mr. Froehlich cites the case of *Harris v. Fort Oglethorpe State Bank*, 721 F.2d 1052 (6th Cir.1983). In *Harris* the United States

Court of Appeals for the Sixth Circuit affirmed the Bankruptcy Court's decision in *In re Harris*, referred to *supra*. In *Harris* the court denied a creditor relief from the Chapter 13 co-debtor stay. *Id.* at 1054. *Harris* is distinguishable from the current case, however, in that the plan provided that the unsecured creditor seeking relief from the stay was to be paid in full with interest. *Id.* The court in *Harris* reasoned,

> The rights of the creditor are not completely ignored. In order to assure that the creditor receives the benefit of its bargained-for guarantee, relief from the automatic stay is available under limited circumstances; when the debtor's plan proposes not to pay the creditor in full; or when failure to lift the stay would cause the creditor irreparable harm.

*Id.* The court in *Harris* determined that the mere delay to the creditor in receiving its full payment under the plan did not constitute irreparable harm. *Id.* In the current case, however, the court is not concerned with a delayed full payment under the plan, but rather the near certainty that American will not receive any material payment of its unsecured claim through the plan.

The court does not believe the creditor must be stayed until the conclusion of the plan simply because the amounts of the pro rata payments are uncertain. In *In re Garrett*, 36 B.R. 432 (Bankr.M.D.Tenn. 1984) the court was confronted with a similar situation under Chapter 13 in which the amount of the payments to unsecured creditors was uncertain. The debtors were to pay into the plan either $9,000.00 or 20% of all filed unsecured claims, whichever was greater. *Id.* at 433. Not all of the claims had yet been filed at the time the motion for relief from the co-debtor's stay was brought. *Id.* Thus the court was unable to determine what percentage of the unsecured claim would be paid. *Id.* The court in *Garrett* lifted the co-debtor's stay in spite of the uncertainty of the payments under the plan. *Id.* The court concluded, however, that there was a potential that the creditor might be overpaid as a result of receiving payments both from the debt-

ors under the plan and from the co-debtor. To protect against overpayment the court subrogated the co-debtor to the creditor's position as an unsecured creditor in the debtor's bankruptcy case in the amount of any payment in excess of the creditor's unsecured claim.

In the current case American's $10,-279.63 unsecured claim is 4.9% of the total unsecured claims of $209,943.73. The Debtors project they will have $2,274.00 available to pay the claims of unsecured creditors during 1987. Assuming the Debtors' disposable income remains stable over the next two years, American will receive a total of $334.28 on its $10,279.63 unsecured claim. This means it will receive 3.2% of the value of its claim. This court finds persuasive the reasoning of the *Jacobsen* court, *supra*. When it is highly probable that a creditor will never receive a material payment on its claim through the plan, there is no reason to delay lifting the co-debtor's stay until the conclusion of the plan payments. There is substantial uncertainty about how much the payments to unsecured creditors will be in a Chapter 12 case. However, the danger of overpayment of American's claim is eliminated by subrogating Victor Froehlich to American as an unsecured creditor in the Binstock's Chapter 12 proceeding. If American is able to collect the entire amount of its unsecured claim from Victor Froehlich, any payments it receives from the Debtors through the plan will be paid over to Victor Froehlich.

Finally, Mr. Froehlich notes that the Debtors have placed a $10,500.00 market value on the mobile home in the liquidation analysis attached to their plan filed July 21, 1987. The Debtors, however, only intend to pay the bank $9,000.00 for the secured portion of its claim. Mr. Froehlich states, "[i]t would seem reasonable to have made the bank insist that the Binstocks pay it at least what they [sic] own liquidation analysis shows the collateral to be worth. Froehlich should not be penalized for the bank's failure to do so." The court notes that the "liquidation value" assigned the mobile home in the liquidation analysis is $9,975.00.

Mr. Froehlich became primarily liable to American as a joint maker when he co-signed the promissory note. *See Luverne State Bank v. Daily,* 51 N.D. 688, 200 N.W. 793 (1924); *Baird v. Herr,* 64 N.D. 572, 254 N.W. 555 (1934). As a joint maker he is individually liable to American for the full amount of the debt. His recourse for any payments he makes on the debt is against the Debtors. *See* N.D.Cent.Code § 41–03–52(5) (1983) [U.C.C. § 3–415(5)]. Thus Mr. Froehlich may not complain that he will be forced to pay too large of a portion of the debt to the bank, when he is in fact liable to the bank for the entire debt.

Accordingly, for the reasons stated, IT IS ORDERED that American is released from the co-debtor stay imposed by 11 U.S.C. § 1201. It may proceed in a collection action against Victor Froehlich in the amount of $10,279.63. IT IS FURTHER ORDERED that Victor Froehlich is subrogated to American to the extent of any payments received from the Binstocks on account of the unsecured claim. This subrogation is to take effect when American has collected the full amount of its unsecured claim of $10,279.63 from Victor Froehlich.